Mary Smallwood operated a daycare center in Lanett for 27 years. On March 5, 1996, the Department of Human Resources ("DHR") suspended her license to operate a group daycare home, pending an investigation of reports that she had sexually abused three children, had emotionally abused one child, and had violated the DHR minimum standards with respect to corporal punishment and parental accessibility to her daycare center.
In May 1996, DHR conducted a combined child abuse/prerevocation of license hearing at which it alleged, and offered evidence to prove, the following grounds for revoking Smallwood's license:
 (1) Smallwood had sexually abused 2 1/2-year-old A.C. at various times from August 1995 to February 1996;
 (2) Smallwood had emotionally abused M.B. at various times from August 1994 through April 1995;
 (3) Smallwood had sexually abused three-year-old T.S. from August 1992 through July 1994;
 (4) Smallwood had sexually abused L.K. at various times from March 1993 to April 1993;
 (5) Smallwood had sexually abused one-year-old M.S. during December 1995;
 (6) Smallwood had, by failing to keep her premises accessible to parents, violated the following provision of the Minimum Standards for Group Daycare Homes: "[P]arents shall be informed of their right to visit and observe their child in the group daycare home during the hours of care";
 (7) Smallwood had, by spanking or paddling children in her care, violated the following provision of the Minimum Standards for Group Daycare Homes: "[N]o corporal/physical punishment shall be used."
At the conclusion of the hearing, the administrative law judge made the following findings of fact and conclusions of law:
 (1) The evidence presented a "reason to suspect" the truth of the allegation that Smallwood had sexually abused A.C.
 (2) The evidence did not support the allegation that Smallwood had emotionally abused M.B.; that charge was dismissed.
 (3) The evidence presented a "reason to suspect" the truth of the allegation that Smallwood had sexually abused T.S.
 (4) The evidence did not support the allegation that Smallwood had sexually abused L.K.; that charge was dismissed.
 (5) The evidence presented a "reason to suspect" that Smallwood had sexually abused M.S. *Page 686 
 (6) The evidence established that Smallwood had violated the Minimum Standard relating to accessibility.
 (7) The evidence established that Smallwood had violated the Minimum Standard relating to corporal punishment.
Following the hearing, Smallwood's daycare license was revoked,see § 38-7-8, Ala. Code 1975, and her name was placed on a statewide central registry of child abusers, see § 26-14-8(a), Ala. Code 1975.
Section 38-7-9, Ala. Code 1975, gives a daycare licensee whose license has been revoked the right to appeal to DHR for a "fair hearing." Pursuant to that statute, Smallwood requested and received a fair hearing, which in this case consisted of a review of the record by an administrative law judge different from the one who had presided over the child abuse/prerevocation hearing. The fair hearing officer affirmed DHR's revocation of Smallwood's license and concurred with all but two of the administrative law judge's conclusions of law. As to issues (1) and (5), the fair hearing officer determined:
 (1) The evidence was sufficient to find that sexual abuse relating to A.C. was "indicated" rather than that there was "reason to suspect" it.
 (5) The evidence was insufficient to find a "reason to suspect" the truth of the sexual abuse allegation relating to M.S. The allegation was determined to be "not indicated."
Smallwood appealed to the Montgomery Circuit Court. Section38-7-9, Ala. Code 1975, provides that the circuit court, on review of a license revocation, "may set aside the final decision of the department only upon a finding of the court that such final decision was illegal, capricious or unsupported by the evidence." The circuit court determined that the decision to revoke Smallwood's daycare license was neither illegal nor capricious, and that it was fully supported by the evidence. That court affirmed DHR's revocation of Smallwood's license.
On appeal to this court, Smallwood raises a number of issues but, because it is dispositive, we will address only one of them: whether the decision to revoke Smallwood's license was supported by the evidence.
 Evidence Relating to the Alleged Sexual Abuse of A.C.
A.C. was in Smallwood's daycare center from the age of six weeks (October 1993) until February 1996. In early 1995, the little girl had a yeast infection and her mother asked Smallwood to apply ointment to the child's vaginal area. Then, for five months, beginning in late 1995 and continuing until February 1996, A.C. complained to her parents that her "bottom hurt." A.C.'s mother explained that, by her "bottom," A.C. meant her vaginal area. Her parents checked for a rash or vaginal irritation but could find nothing.
Then, on February 26, 1996, A.C.'s mother asked A.C. why her bottom hurt, and the child replied that E., a little boy in daycare with her, had hurt her. The mother knew that A.C. had a habit of blaming E. for things that were not his fault, so she asked, "Are you sure E. hurt you?" A.C. then admitted that E. had not hurt her. Her mother asked A.C. who had hurt her, and A.C. replied, "Mama Mary did it." "Mama Mary" was what the children in daycare called Mrs. Smallwood.
When asked for details of how Smallwood had hurt her, A.C. stated that Mama Mary had put her finger and a "long pink skinny thing" in A.C.'s bottom. A.C. repeated the story to her father and both grandmothers. She told one of her grandmothers that a giraffe had hurt her. She also expressed to her parents a fear of the giraffe. She said that the giraffe was in the laundry room and under the refrigerator at home and was at Mama Mary's house.
In late February 1996, A.C.'s mother took A.C. to a pediatrician, who found no physical evidence of sexual abuse but stated that, if such an act had occurred a good while earlier, there might not be any signs of it at the time of the examination. The physician told A.C.'s mother that he was required by law to report the complaint of abuse if she did not do so. The mother reported the complaint to local police authorities, who then contacted DHR, and an investigation was initiated. *Page 687 
When DHR investigators interviewed A.C., the little girl said that Mama Mary had hurt her bottom with her hand, or with a red and blue stick. During the interview, A.C. also mentioned a giraffe and indicated that a giraffe had been in the interview room at the local DHR office.
A.C. did not testify at the child abuse/prerevocation hearing. The evidence relating to the alleged sexual abuse of A.C. came from A.C.'s parents and two grandmothers. A videotaped interview of A.C. by DHR investigators was also presented. The parents and grandmothers related A.C.'s out-of-court statements regarding Mrs. Smallwood and said that A.C. was scared of Smallwood and did not want to return to her daycare center.
Although A.C.'s relatives said that A.C. had told them that Smallwood had hurt her during naptime at the daycare center when the other children were asleep, A.C. told the DHR interviewer that Smallwood had hurt her while the other children were watching. When the DHR interviewer asked A.C. if she wanted to go back to Smallwood's house, the child said "no." When she was asked why she did not want to return, A.C. replied, "Because I have new shoes on."
Smallwood denied ever having hurt or having inappropriately touched A.C. She testified that she had applied vaginal cream to the child at the mother's request. She said she could think of no reason why A.C. would make up a story concerning sexual abuse.
 Evidence Relating to the Alleged Sexual Abuse of T.S.
To support its allegation that Smallwood had sexually abused T.S., DHR presented the testimony of S.S., the mother of T.S. She testified that, four years earlier, when T.S. was three years old, T.S. had a bad yeast infection that the mother suspected was the result of sexual abuse. Once, when T.S. returned from spending a weekend with Mrs. Smallwood, the child cried out in pain when she urinated. When her mother examined her, she found that the little girl's vaginal area was red and swollen. T.S. took her mother's hand and stroked her vaginal area with it. S.S. could not remember what, if anything, T.S. said on that occasion, but S.S. attributed the action to the child's having been molested by Mrs. Smallwood.
S.S. and her husband confronted Mrs. Smallwood with their suspicions. Smallwood denied purposely harming T.S., claiming only that she must have "bathed her too hard" with a harsh soap. After the allegations of abuse concerning A.C. surfaced, T.S. was interviewed by a sheriff's deputy. During that interview, T.S. denied ever having been hurt by Mrs. Smallwood. She also denied being scared of Mrs. Smallwood. The testimony of S.S. was not subject to a hearsay objection because S.S. related no out-of-court statements made by her daughter. T.S. made no statements concerning Mrs. Smallwood.
DHR has four dispositions for child abuse investigations: "indicated," "reason to suspect," "unable to complete," and "not indicated."[1] Both the administrative law judge and the fair hearing officer determined that there was a "reason to suspect" the truth of the allegations regarding T.S. Those determinations were plainly erroneous because the testimony of S.S. did not establish a "reason to suspect" that Smallwood had abused T.S.
The testimony of S.S., which was based entirely on her own speculation and surmise, proved nothing with respect to the alleged abuse of T.S. by Smallwood. "Evidence which affords nothing more than speculation, conjecture or guess is wholly insufficient to warrant the submission of a case to [a] jury [or to support an administrative ruling]." *Page 688 Williams v. Palmer, 277 Ala. 188, 193, 168 So.2d 220, 224
(1964). The findings of fact on this point by the administrative law judge and the fair hearing officer were unsupported by any evidence.
Because there was no evidence that T.S. had been sexually abused by Smallwood, the child abuse ground for revoking Smallwood's license hinges entirely on whether the proof relating to the alleged abuse of A.C. was admissible and, if so, whether it was sufficient to support the hearing officer's findings and conclusions. Those findings were supported only by evidence that would, in a circuit court civil case, be inadmissible hearsay. We must, therefore, decide whether such evidence was admissible in this administrative proceeding.
 The Admission of Hearsay
Section 41-22-13(1), a part of the Alabama Administrative Procedure Act ("AAPA") provides, in pertinent part, the following:
 "The rules of evidence as applied in nonjury civil cases in the circuit courts of this state shall be followed. When necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible thereunder may be admitted (except where precluded by statute) if it is of a type relied upon by reasonably prudent persons in the conduct of their affairs."
(Emphasis added.) DHR Administrative Rule 660-1-5-.20 states:
 "1. The rules of evidence as followed by the circuit courts of the State are applicable to the hearing but strict adherence is not required. Evidence, including hearsay evidence, will be received at the discretion of the hearing officer if it is [of] a type commonly relied upon by reasonably prudent persons in the conduct of their affairs. Relevant and material evidence, including hearsay evidence, visual drawings, and testimony about the use of anatomically correct dolls, is admissible at the hearing.
 "2. All witnesses may testify at the hearing without prior qualification.
 "3. The hearing officer shall determine the weight and credibility to be given to the testimony of all witnesses.
 "4. Videotaped, deposition, or other recorded testimony of a witness may be allowed.
 "5. Leading questions may be allowed of a witness.
 "6. Testimony and evidence admissible under the following statutes are also admissible in hearings: Code of Alabama 1975, Sections 12-15-65(h), 15-25-1 through -6, and 15-25-30
through -40."
(Emphasis added.)
Both the AAPA and the DHR administrative rule allow the admission of hearsay "if it is of a type relied on by reasonably prudent persons in the conduct of their affairs." In addition, the administrative rule allows for the receipt of evidence that would be admissible under §§ 15-25-30 through -40, Ala. Code 1975. Those Code sections concern the admission of "an out-of-court statement made by a child under 12 years of age at the time of the proceeding concerning an act that is a material element of any crime involving . . . a sexual offense." See § 15-25-31, Ala. Code 1975.
Section 15-25-32 provides that, in a criminal prosecution for a child sexual offense, an out-of-court statement may be admitted if:
 "(1) The child testifies at the proceeding, or testifies by means of videotape deposition as provided by Section 15-25-2, or testifies by means of closed circuit television as is provided in Section 15-25-3, and at the time of such testimony is subject to cross-examination about the out-of-court statements; or
 "(2)a. The child is found by the court to be unavailable to testify on any of these grounds:
"1. The child's death
 "2. The court finds that there are reasonable grounds to believe that the defendant or someone acting on behalf of the defendant has intentionally removed the child from the jurisdiction of the court;
"3. The child's total failure of memory; *Page 689 
"4. The child's physical or mental disability;
 "5. The child's incompetency, including the child's inability to communicate about the offense because of fear or a similar reason; or
 "6. Substantial likelihood that the child would suffer severe emotional trauma from testifying at the proceeding or by means of closed circuit television; and
 "b. The child's out-of-court statement is shown to the reasonable satisfaction of the court to possess particularized guarantees of trustworthiness."
(Emphasis added.)
Section 15-25-37 sets out 13 factors a court may consider in determining "whether a statement possesses particularized guarantees of trustworthiness." Those factors are:
"(1) The child's personal knowledge of the event;
"(2) The age and maturity of the child;
 "(3) Certainty that the statement was made, including the credibility of the person testifying about the statement;
 "(4) Any apparent motive the child may have to falsify or distort the event, including bias, corruption or coercion;
"(5) The timing of the child's statement;
 "(6) Whether more than one person heard the statement;
 "(7) Whether the child was suffering from pain or distress when making the statement;
"(8) The nature and duration of any alleged abuse;
 "(9) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
 "(10) Whether the statement has a 'ring of verity,' has an internal consistency or coherence, and uses terminology appropriate to the child's age;
 "(11) Whether the statement is spontaneous or directly responsive to questions;
 "(12) Whether the statement is suggestive due to improperly leading questions;
 "(13) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the chid's statement."
See also Idaho v. Wright, 497 U.S. 805, 822, 110 S.Ct. 3139,111 L.Ed.2d 638 (1990) (listing factors pointing to reliability of a child sexual abuse victim's statement, the Court observed that "the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made").
Sections 15-25-30 through -40 are, by their terms, applicable to criminal prosecutions. Those statutes address theSixth Amendment right of a defendant in a criminal prosecution to confront and cross-examine the witnesses against him. SeeRicherson v. State, 668 So.2d 130, 134-35
(Ala.Crim.App. 1995). The Confrontation Clause, found in theSixth Amendment to the United States Constitution, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The question does not appear to have been raised or answered in Alabama, but other jurisdictions have held that the Confrontation Clause of the Sixth Amendment does not apply in civil proceedings. See,e.g., In Interest of K.L.M., 146 Ill. App.3d 489, 494,496 N.E.2d 1262, 1266, 100 Ill.Dec. 197, 201 (1986); In reBurchfield, 51 Ohio App.3d 148, 154, 555 N.E.2d 325, 331
(1988); In re James A., 505 A.2d 1386, 1390 (R.I. 1986); Chmelav. State Dep't of Motor Vehicles, 88 Wn.2d 385,561 P.2d 1085, 1088 (1977); In re W.J.C., 124 Wis.2d 238, 239,369 N.W.2d 162, 163 (1985), review denied, 125 Wis.2d 583,375 N.W.2d 215 (1985).
Although the Confrontation Clause is not specifically applicable in civil cases, the right of a civil litigant to cross-examine the witnesses against him has historically been considered a fundamental component of a fair trial, and it may, in some circumstances, be a required element of procedural due process. See, e.g., Jenkins v. McKeithen, 395 U.S. 411,89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Willner v. Committee onCharacter Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224
(1963); In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682
(1948). *Page 690 
A civil litigant's due process right to cross-examine the witnesses against him is, however, not absolute. The United States Supreme Court has recognized that due process is not a rigid concept but one that must, of necessity, be determined by balancing the conflicting rights of the entities involved.Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208,31 L.Ed.2d 551 (1972). In Stanley, the Court observed:
 "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation and firmly establishes that what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."
405 U.S. at 650-51 [92 S.Ct. 1208].
The "government function involved" in this case is an important one. The State has a vital interest in the safety of all children, and it is rightly concerned with the well-being of those children in the daycare centers it licenses. Because child abuse almost always occurs in secrecy, with the child being the only witness, and it is, therefore, difficult to prove, see Note, A Comprehensive Approach to Child HearsayStatements in Sex Abuse Cases, 83 Colum. L.Rev. 1745 (1983), the State's interest dictates that DHR should be allowed to rely on some hearsay in a child abuse hearing. See generallyWaters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878,128 L.Ed.2d 686 (1994) (agencies can base findings of fact on evidence that is reasonably reliable, even if that evidence would not be admissible in a jury trial).
Smallwood also has an important interest at stake. She has a property interest in continuing to operate her daycare center.See Bowman v. Alabama Department of Human Resources,857 F. Supp. 1524, 1529 (M.D. Ala. 1994). Revoking her daycare license and placing her name on a central registry of child abusers prevents her from pursuing what has been, for 27 years, the source of her livelihood. Although Smallwood's interest is not equivalent to that at stake in a criminal prosecution, or to that at stake in a proceeding involving the loss of a fundamental right, compare Santosky v. Kramer, 455 U.S. 745,102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights), it is, nonetheless, a weighty one. Smallwood's interest dictates that DHR should be permitted to rely on hearsay only if it has a strong indicium of reliability.
The requirements of §§ 15-25-30 through -40 are not, by their terms, mandated in civil proceedings, and DHR Administrative Regulation 660-1.5-.20 does not require that, to be admissible in an administrative proceeding, hearsay testimony satisfy the prerequisites of those criminal procedure statutes. However, as this court noted in State Dep't of Human Resources v. Gibert,681 So.2d 560 (Ala.Civ.App. 1995), cert. denied, 681 So.2d 564
(Ala. 1996), §§ 15-25-30 through -40 have been "adopted by the [D]epartment [of Human Resources] as part of its procedure for conducting administrative hearings on child abuse allegations." 681 So.2d at 563. See also Fettig v. Department of Social Health Services, 49 Wn. App. 466, 744 P.2d 349 (1987), review denied, 110 Wn.2d 1003, (1988) (wherein the court applied the requirements of a criminal procedure statute similar to §15-25-32 to an administrative proceeding concerning revocation of a daycare license even in the absence of an administrative regulation incorporating the criminal procedure statute).
By incorporating the criminal procedure statutes into its evidentiary rule for child abuse hearings, DHR has manifested an intent to have the policy considerations underlying those statutes taken into account in determining whether a child's out-of-court statements are admissible at an administrative proceeding. DHR has apparently determined that it is appropriate for a hearing officer, faced with determining whether a child's out-of-court statement is "of a type relied upon by reasonably prudent persons in the conduct of their affairs," to inquire whether the child is unavailable and whether the child's statement possesses "particularized guarantees of trustworthiness," as outlined in § 15-25-32(2)a. and b. Such an inquiry serves to strike a balance between the *Page 691 
interests of one such as Mrs. Smallwood, accused of child abuse, who could lose her livelihood upon false allegations of child abuse, and the interests of the public at large, and daycare children in particular, who could be subjected to irreparable harm in the event of true but difficult-to-prove allegations of child abuse.
In State Dep't of Human Resources v. Gibert, supra, the administrative hearing officer specifically found that the §15-25-32 exception applied. He determined that the child was "unavailable" on the ground set out in § 15-25-32(2)a.(6), and that the child's out-of-court statement possessed particularized guarantees of trustworthiness, as required by §15-25-32(2)b. Gibert, 681 So.2d at 562. In Gibert, DHR also presented other evidence that tended to corroborate the child's out-of-court statements. In that case,
 "the child's therapist testified that she thought the child's allegations were truthful, and the child's mother testified that the child had suffered much emotional trauma over the incident."
681 So.2d at 562.
The administrative law judge did not determine either that A.C. was "unavailable" or that her out-of-court statements possessed "particularized guarantees of trustworthiness" before admitting and considering them as evidence. Nor did the administrative law judge determine that A.C.'s hearsay statements were "of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs," as mandated by DHR Administrative Rule 660-1-5-.20.
Furthermore, DHR presented no expert testimony tending to show the trustworthiness of A.C.'s out-of-court statements. Noting the benefit to the trier of fact of expert testimony in a child sexual abuse case, our supreme court has stated, "[E]xpert testimony should be allowed to explain the emotional effects of sexual abuse upon [a victim], so that the triers of fact may appropriately draw conclusions from the testimony."Ex parte Hill, 553 So.2d 1138, 1139 (Ala. 1989). See also Sextonv. State, 529 So.2d 1041, 1049-50 (Ala.Crim.App. 1988) (State presented testimony of clinical psychologist who had treated the child; psychologist described the "generally accepted symptoms" displayed by a child abuse victim, and explained that it was common for victims to delay reporting abuse). Seegenerally McCord, Expert Psychological Testimony About ChildComplaints in Sexual Abuse Prosecutions: A Foray into theAdmissibility of Novel Psychological Evidence, 77 J.Crim. L. 
Criminology 1 (1986).
Mrs. Smallwood — not DHR — presented the only expert testimony, that of Mahlam Tazewell Jones, who has a Ph.D. degree in clinical psychology. Dr. Jones, who stated that he was experienced in dealing with child abuse complaints, explained that very young children like A.C. have unreliable memories and tend to confuse fact with fantasy. Those children, he said, are extremely suggestible and desirous of pleasing adults, to the point that they will agree with adults who might unwittingly "plant" a suggestion of abuse. Dr. Jones stated that the younger a child is, the more suggestible he or she is likely to be, and that when a very young child is repeatedly questioned about an event, he or she will tend to agree with parental or other authority figures.
In the absence of a specific finding by the administrative law judge that A.C.'s statements were trustworthy, or that they were "of a type relied upon by reasonably prudent persons in the conduct of their affairs," we find no basis in the record before us for the admission of A.C.'s out-of court statements. Instead, we find several reasons to conclude that A.C.'s statements had such a high risk of unreliability as to be unacceptable as evidence.
First, A.C.'s statements were not intrinsically self-verifying. Many of the child sexual abuse cases have found "particularized guarantees of trustworthiness" from a child's graphic narration of events that a child without sexual experience would not be expected to know — occurrences such as oral or anal sexual contact, male ejaculation, the description of semen, etc. See, e.g., In Interest of K.L.M., 146 Ill. App.3d 489,494, 496 N.E.2d 1262, 1266, 100 Ill.Dec. 197, 201 (1986). Here, however, A.C.'s description of being "hurt on her bottom" could just as easily *Page 692 
refer to the discomfort a little girl associated with the application [by a finger or from a tube ("a long pink skinny thing")] of an ointment to cure a vaginal rash as it could refer to sexual molestation. The statement itself, therefore, has little or no inherent guarantees that abuse occurred.
Second, it is impossible to overlook the fact that A.C.'s statements as to the alleged abuse were intertwined with elements of fantasy (being hurt by a giraffe), and were inconsistent on material points. She contradicted herself concerning whether the alleged abuse occurred in secret while the other children were asleep, or whether it occurred while the other children were watching. Although A.C. was, according to her parents and grandmothers, scared of Mrs. Smallwood, A.C. expressed no fear of Smallwood during the videotaped interview with DHR investigators. When asked why she did not want to return to Smallwood's daycare, A.C. said, "Because I have new shoes on."
This court has viewed the videotaped interview of this 2 1/2-year-old child. The only firm conclusion we can reach after watching it is that no firm conclusion about whether the alleged abuse occurred is possible from seeing that exchange. A.C. is obviously a bright child, but she is barely past infancy; her ability to perceive, to order, and to relate events is limited, fanciful, and, by adult standards, illogical. The videotape does not lend support to a claim that A.C.'s statements were "of a type relied on by reasonably prudent persons in the conduct of their affairs."
This court recognizes that allegations of child sexual abuse are difficult to prove; it also recognizes that they are equally difficult to defend against. Without a finding by the administrative law judge that A.C.'s statements bore an indicium of reliability, the record provides us with no basis to make that determination, and, in fact, it provides several grounds for making the contrary determination. We, therefore, hold that the administrative law judge erred by admitting and considering the out-of-court statements made by A.C.
 Evidence Relating to Accessibility and Corporal Punishment
The testimony was undisputed that Mrs. Smallwood's daycare center was located on a very busy street and that she kept the front door locked as a safety precaution. Several parents testified that Smallwood told them her front door would be locked and to come to the back door and knock if they wished to enter during the children's naptime. Some of the parents stated that they found it inconvenient to wait at the back door until Mrs. Smallwood answered their knocks. None testified, however, that he or she had been absolutely barred from entering the house. The evidence least favorable to Mrs. Smallwood was testimony that one parent had had to wait as long as eight minutes before Smallwood came to the door after a knock. Most of the parents who testified stated that they had no trouble and no lengthy wait before they could retrieve their children and that they felt free to come to the daycare center at any time to observe their children. The administrative law judge found that Smallwood had failed to keep her premises accessible to parents and thereby had violated the following provision of the Minimum Standards for Group Daycare Homes: "[P]arents shall be informed of their right to visit and observe their child in the group daycare home during the hours of care." That finding is simply not supported by the evidence.
Mrs. Smallwood admitted that she had paddled or spanked children. She testified that she had used a paint stirrer and had sometimes given the children a very light "pop" on the bottom. She stated that she did not know that that kind of discipline was in violation of DHR's Minimum Standards. The administrative law judge found that Smallwood had spanked or paddled children in her care and had thereby violated the following provision of the Minimum Standards for Group DaycareHomes: "[N]o corporal/physical punishment shall be used." That finding was supported by the evidence and is due to be affirmed.
In summary, we hold as follows: *Page 693 
 1. that there is no evidence to support the finding of a "reason to suspect" that Smallwood had abused T.S.;
 2. that the administrative law judge erred by admitting the out-of-court statements of A.C. and that, without those statements, there is no evidence to support the finding that Smallwood had abused A.C.;
 3. that the evidence is insufficient to support the finding that Smallwood's daycare center was inaccessible to parents; and
 4. that the evidence is sufficient to support the finding that Smallwood had used corporal punishment by spanking or paddling some of the children in her daycare center.
The judgment of the circuit court affirming DHR's revocation of Smallwood's license and placing Smallwood's name on the statewide registry of child abusers is reversed. The cause is remanded with instructions for the circuit court to remand the matter to DHR for the following determination: whether the one ground alleged in support of revoking Smallwood's license thatis supported by the evidence (that Smallwood had used corporal punishment) warrants the revocation of her license. If DHR determines that that ground does not warrant the revocation of Smallwood's license, then DHR is directed to reinstate her license without delay.
REVERSED AND REMANDED WITH DIRECTIONS.
ROBERTSON, P.J., and YATES, J., concur.
MONROE and THOMPSON, JJ., concur in the result.
[1] Sections 26-14-8(a)(1) and (2), Ala. Code 1975, provide the following definitions for "indicated" and "not indicated":
 "INDICATED. When credible evidence and professional judgment substantiate that an alleged perpetrator is responsible for child abuse or neglect.
 "NOT INDICATED. When credible evidence and professional judgment [do] not substantiate that an alleged perpetrator is responsible for child abuse or neglect."
No definition for "reason to suspect" or for "unable to complete" appears in the Code. At the hearing, DHR personnel testified that a child abuse case is categorized as "reason to suspect" if the evidence does not measure up to the higher standard of an "indicated" report, but it is stronger than a "not indicated" report.